### JOHNSTON v. FAIRMONT MILLS et al.

(Circuit Court of Appeals, Fourth Circuit. February 2, 1904.)

No. 478.

1. SALES—CONTRACT MADE THROUGH BROKER—REQUIREMENT OF CONFIRMATION BY PRINCIPAL.

Where there was an established custom in the cotton trade for both buyer and seller to confirm to each other in writing a sale made by a broker, an offer by a broker to sell cotton for future delivery to a cotton mill, accepted by the mill company "subject to confirmation" by the seller named in the offer, did not create a contract, and the acceptance was subject to withdrawal at any time before such confirmation.

2. SAME—ACCEPTANCE OF OFFER.

A proposal to accept an offer for the purchase of cotton on terms varying materially from those offered is a rejection of the offer, and does not create a contract binding the purchaser.

3. SAME—WAIVER OF CONFIRMATION.

Where an offer by a broker to sell cotton for future delivery was accepted subject to confirmation by his principal, as customary in the trade, and before confirmation the seller became insolvent, a demand for security by the intending purchaser was not a waiver of the requirement of confirmation.

In Error to the Circuit Court of the United States for the District of South Carolina.

For opinion below, see 116 Fed. 537.

This is a writ of error to a judgment of the Circuit Court of the United States for the District of South Carolina rendered on the 4th day of August,

---

¶ 2. See Sales, vol. 43, Cent. Dig. § 47.

1902, dismissing at the cost of the plaintiff a certain action at law instituted in said court against the defendants. The facts may be briefly stated as follows: The appellant instituted this action for the recovery against the Fairmont Mills, a corporation of the state of South Carolina, and L. Guy Harris, as receiver of said corporation, damages for the breach of two alleged contracts entered into between the said Fairmont Mills and himself on or about the 10th and 15th days of October, 1900, under which the plaintiff contracted to sell and deliver to the Fairmont Mills 500 bales of cotton, 100 of said bales to be delivered during each of the months of February, March, April, May, and June, 1901, to be paid for as follows: For the cotton delivered in February, March, and April, 1901, 10⅜ cents per pound; for the remainder, 10⅛ cents per pound. That after the making of said contracts cotton declined rapidly, and on or about October 28, 1900, the Fairmont Mills notified the plaintiff that it canceled the contracts, and would not accept, receive, or pay for the cotton. That the plaintiff was always ready to carry out the contract on his part, and was prevented from so doing by the action of the defendant. That, owing to the decline in the price of cotton, plaintiff was prevented from placing the cotton at the price agreed upon, and, as a consequence, was damaged in the sum of $4,687.50. The defendants deny the existence of the contracts, and, while conceding that there were negotiations through one C. P. Mathews, a cotton broker, looking to such contracts, they insist that the broker did not submit to the two parties the same terms, and never reached an agreement as to the terms, and the contracts were never consummated. Defendants further assert that, while negotiations were pending, plaintiff became insolvent, whereupon they warned him, unless he furnished a proper guaranty that he could perform the contract on his part, if completed, by noon of the 27th of October, 1900, they would not conclude the same; that the plaintiff failed to do this, and the defendant mills notified him that the deal was off, and sought cotton elsewhere.

A jury trial being waived, pursuant to the act of Congress, the case was submitted to the judge of the court below, who, after stating the facts to be:

"The transaction occurred through the agency of C. P. Mathews. Mr. Mathews is a cotton broker residing in Spartanburg, South Carolina, doing business in the Carolinas, chiefly with cotton mills. On 10th October, 1900, Mr. Harris, president of the Fairmont Mills, made an offer to him, as such broker, to buy cotton, 100 bales for each of the months of February, March, and April, at 10⅜ cents. He communicated the offer by telegram to the plaintiff, at Meridian, Mississippi, and received by telegram, the same day, authority to accept the offer of 300 bales at 10⅜, shipments named. He communicated by telephone to Mr. Harris the receipt of this authority, and on the next day (11th October) wrote Mr. Harris as follows:

"'I beg to confirm sale to you of 300 B-C to you at 10⅜ landed Moore's So. Ca., for a/c of A. S. Johnston, Meridian, Mississippi. The cotton to be half each, st. and good mid., to be shipped 100 B-C each in February, March and April; wts. guaranteed within three pounds. Please confirm sale and oblige,
"'Yours truly,                                          C. P. Mathews.'

"It does not appear, except by this letter, that Mr. Harris knew who would furnish the cotton. On receipt of this letter, Mr. Harris replies:

"'I have your letter of this date [11th October] confirming sale to us of 300 B-C, landed at Moore's, So. Ca. The cotton to be half each st. and good mid., and 100 bales delivered each month of February, March and April next, wts. guaranteed within three pounds, and hereby accept offer of same subject to A. S. Johnston's confirmation.
"'Yours truly,                                          W. I. Harris, Pres.'

"On the 15th October, 1900, Mr. Harris made another offer to C. P. Mathews for the purchase of 200 bales of cotton at 10⅛, deliverable 100 bales each in months of May and June, 1901. This was communicated also to A. S. Johnston, at Meridian, Miss., by wire, and Johnston, by wire, answered, 'Confirm sale 100 bales, each May and June, st. mid. to good mid., 10⅛.' On its receipt, Mathews notified Harris, and on the next day he wrote a letter identical in terms, except as to number of bales and the price, with his former letter. To this Harris replies, using the same terms as his reply to the former letter, varying only as to the number of bales and the price, and ending, as in his

former letter, 'sold to us by A. S. Johnston, Meridian, Miss., and subject to his confirmation.' The usage of the mills is always to require confirmation by the principal of contracts made through the broker, and this confirmation is made to the purchaser direct—sent either by mail or through the broker. In the present instance, Mathews requested Johnston to confirm direct to Harris. After the 15th, and between that day and the 25th, of October, unpleasant rumors were in circulation as to the solvency of Johnston. Whereupon Mr. Harris, on 25th October, demanded from Mathews security for the performance of these contracts by Johnston. Mathews wired this demand to Johnston, who replied, referring to C. W. Robinson and John Kenyon. Mathews telegraphed to these gentlemen to confirm this, but got no reply. On 27th October, Mathews not furnishing the security demanded, Harris canceled the contracts. On the 29th October, 1900, Mathews inclosed to Harris letter of Johnston confirming the contract of 10th October, except that the place of delivery was stated to be Spartanburg, S. C., instead of Moore's, as stated by Mathews. On or about 1st November, 1900, Johnston went to Spartanburg, and, in company with Mr. Bozeman, his attorney, and Mr. Caine, of Mississippi, offered Mr. Caine as his surety for delivery of the cotton as per contracts. Mr. Harris made no objection to the character and sufficiency of the security, but refused to accept it, as the contracts were canceled. Mr. Mathews says that in this transaction he acted merely as agent of each party in making the sale, and assumed no responsibility."

—Announced his findings thereon, and conclusions of law, as follows:

### "Findings of Fact.

"(1) The plaintiff is a citizen and resident of the state of Mississippi, and the defendant corporation, the Fairmont Mills, and L. Guy Harris, receiver, are citizens and residents of the state of South Carolina.

"(2) C. P. Mathews is a cotton broker at Spartanburg, South Carolina, doing business in the Carolinas.

"(3) On 10th October, 1900, negotiations were entered into between W. J. Harris, president of Fairmont Mills, and C. P. Mathews, for the purchase of three hundred bales of cotton, strict to good middling, at 10⅜ cents per pound, deliverable 100 bales each in the months of February, March and April, 1901, at Moore's, S. C. And on 15th October, 1900, other negotiations were entered into between the same parties for the purchase of 200 bales of cotton at 10⅛ cents per pound, deliverable 100 bales each in the months of May and June, 1901, at Moore's, S. C.

"(4) These negotiations culminated in a written offer on the part of Mathews, acting for A. S. Johnston, the plaintiff, for the delivery of the above-mentioned bales of cotton at the prices and terms and place specified, one-half of each delivery to be good, and one-half strict middling, with the terms added; weights guarantied not to lose more than three pounds per bale.

"(5) Pending these negotiations, telegrams had been passed between Mathews and Johnston, in which the outlines of the proposition were stated. The offer of Mathews gave the offer in detail, and for the first time.

"(6) The detailed offer of Mathews was accepted by Harris, subject to confirmation by Johnston. This is the usage of the trade in Spartanburg by the mills in purchasing cotton for future delivery.

"(7) The confirmation by Johnston not having been received, on 27th October, 1900, Mr. Harris, president of Fairmont Mills, canceled the transaction.

### "Conclusions of Law.

"The contract between plaintiff and defendant, never having been completed, was not binding, and the verdict must be for the defendant."

C. P. Sanders and S. J. Simpson, for plaintiff in error.

William M. Jones (Nicholls & Jones, on the brief), for defendants in error.

Before GOFF, Circuit Judge, and WADDILL and McDOWELL, District Judges.

WADDILL, District Judge (after stating the facts as above). There are a number of assignments of error in this case, but they all relate, in one form or another, to three questions involved: First, whether or not valid contracts were ever entered into between the parties, as set up in the pleadings; second, whether or not, under the circumstances of this case, the defendant the Fairmont Mills was justified in imposing upon the plaintiff the requirement of a guaranty of his ability to carry out the alleged contracts, his insolvency being admitted; and, third, what was the effect of this requirement, as bearing upon the question of the existence of the prior contracts?

This case turns upon the question of fact as to whether the alleged contracts were in fact entered into between the plaintiff and the defendant the Fairmont Mills. Upon that point the learned judge of the lower court decided that they had not, and, after a most careful review of the entire evidence, with the light of the arguments of able counsel thereon, we have reached the same conclusion.

That the minds of parties must meet, and give mutual assent to all of the essential and material features of a contract, is elementary. It cannot be said that such was the case here. The transaction was conducted between the parties through C. P. Mathews, a broker, and he clearly did not have the right, under the facts of this case, to bind either party without their assent; and certainly he had no such authority to speak for the defendant the Fairmont Mills. The evidence conclusively shows that the custom in the trade was for both buyer and seller to each confirm to the other the broker's action in writing. This is testified to by the broker himself, who says:

"When Mr. Harris submitted the offer, I submitted the offer to Mr. Johnston. I had no authority until I got authority from Mr. Johnston to confirm the contract. * * * It was always customary for the mill to confirm to the buyer, and the buyer to the mill. I was acting only as intermediary, and each side wanted the contracts confirmed. * * * There was probably something in the offer that Mr. Johnston would confirm the sale by letter. It was understood that Mr. Harris was to receive written confirmation from Mr. Johnston."

While sundry letters and telegrams passed between Mathews and Johnston, and some between Mathews and Harris, the president of the mill, still it is entirely clear from the whole correspondence that Harris was to receive written confirmation of the sale from Johnston. Mathews' reply to the telegram from Johnston to him confirming the sales of February, March, and April, concludes, "Please confirm contract to W. I. Harris, president, Spartanburg, South Carolina;" and Harris' letter of the 11th of October acknowledging the receipt of the letter from Mathews, relative to confirming the sale concludes, "Weights guaranteed within three pounds, and hereby accept offer of same subject to A. S. Johnston's confirmation." The subsequent letters written by Johnston direct to Harris, president, but received after the cancellation of the contract by Harris, likewise show that Johnston was to have given a written confirmation. In addition to this, the correspondence between Mathews and Johnston also shows that this confirmation was to have been given, and on the day before the cancellation of the contract, October 26, 1900, Mathews wrote:

"If you had only confirmed these sales promptly, there would have been no trouble. A lawyer told one of the mills that the only ground he had for getting

out, would be that you had failed to confirm the sale. Even now I have never been able to get the sales properly confirmed by you. I returned the confirmations to you on the 17th for correction; since then I have not had a line from you."

And on the 27th of October, the day on which the notice was given that the contracts would be canceled if no guaranty was given, Mathews wrote Johnston:

"I will say, however, that all the sales have been confirmed to me regularly, and only awaited your confirmation to the mills for them to confirm. I do not consider you have treated me fairly in the matter."

Johnston thus clearly failed to confirm, in writing, the contracts to Harris. But this is not the only particular wherein the transaction was not consummated. Their minds never met upon other material and essential portions of the undertaking. They agree as to the quantity of the cotton and the price, but in other essentials entirely differ. Harris understood that the cotton was to be delivered at Moore's, S. C. Johnston's confirmation, in so far as it designates a place at all, is at Spartanburg; and it is not entirely clear that he obligated himself to do more than ship the cotton from the place of sale, Meridian, Miss., within the time named. Harris prescribed that the cotton was to be half each strict and good middling, and emphasized in his second letter by stipulating for strict to good middling cotton, one-half each grade. Johnston agreed only that the cotton should be strict good middling, and not one-half each grade. Harris required the delivery of 100 bales each for the months of February, March, April, May, and June; weights to be guarantied within three pounds. Johnston gave no undertaking as to weight, and, as above stated, had in view manifestly shipments, rather than deliveries—at least, his telegrams and letters are liable to this interpretation—which might have resulted disastrously to Harris, but showed clearly that in this, as in other particulars, there was an utter failure of the minds of the parties to meet on these essential features of the undertaking. To bind Harris on his offers, it was necessary that the same should be accepted in the identical terms in which they were made; otherwise his offers imposed no obligation upon him; and a proposal to accept, or an acceptance on terms varying from those offered, is a rejection of the offer.

In Minneapolis Ry. Co. v. Columbus Rolling Mills, 119 U. S. 149, 7 Sup. Ct. 168, 30 L. Ed. 376, it is said:

"As no contract is complete without the mutual assent of the parties, an offer to sell imposes no obligation until it is accepted according to its terms. So long as the offer has been neither accepted nor rejected, the negotiation remains open, and imposes no obligation upon either party. The one may decline to accept, or the other may withdraw his offer, and either rejection or withdrawal leaves the matter as if no offer had ever been made. A proposal to accept, or an acceptance upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation, unless the party who made the original offer renews it or assents to the modification suggested. The other party, having once rejected the offer, cannot afterwards revive it by tendering an acceptance of it."

In 1 Chitty on Contracts (11 Am. Ed.) it is said at page 15:

"Where an agreement is sought to be established by means of letters, such letters will not constitute an agreement, unless the answer be a simple acceptance of the proposal, without the introduction of any new term.' And

again: "If the original offer leave anything to be settled by future arrangement, it is merely a proposal to enter into an agreement. * * * The agreement is not complete until there is upon the face of the correspondence a clear accession on both sides to one and the same set of terms."

In 1 Parson on Contracts (6th Ed.) p. 476, it is said:

"The assent must comprehend the whole of the proposition, it must be exactly equal to its extent and provisions, and it must not qualify them by any new matter."

Applying these principles to the facts in this case, it is manifest that no valid contracts were entered into between the parties, unless it be that Harris' requirement of a guaranty on or before the 27th of October should be treated as a confirmation of the incomplete contracts theretofore existing. This action of Harris clearly should have no such effect, since it is apparent from the entire evidence that he was acting in good faith in what he did. He made the offers as early as the 10th and 15th of October, which were never accepted, and pending this condition of affairs it developed that Johnston had failed in business—his insolvency being admitted, as of the 20th day of October, 1900; and he had the right to withdraw the offer, or otherwise terminate the transaction, which he did not do in undue haste, but insisted that a proper guarantee of the ability of Johnston to perform the contracts on his part should be given him, designating a day beyond which he would not wait. Johnston promised to give this guaranty, and endeavored to do so; but, as is apparent from the correspondence between himself and Mathews, he was unable to furnish the guaranty, and Harris, on the day indicated, declared the transaction at an end. Several days after this date, Johnston was enabled to furnish the guaranty; but Harris then declined to reopen the negotiations, and the transaction thus ended. Harris was under no obligation to conclude his offers, the same never having been accepted; and hence, when there was a failure to comply with the condition that he generously made, he was legally and morally relieved from any liability to Johnston by reason of the transactions in question.

From what has been said, it follows that the action of the lower court should be affirmed.